[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Plaintiffs bring this action claiming a temporary taking of their properties by inverse condemnation.
CT Page 8484
The defendant, Connecticut Hazardous Waste Management Service (Service), is a state agency acting under authority granted to it under C.G.S. § 22a-163. It does not have the power to acquire property. That power rests with the Commissioner of Public Works. C.G.S. § 22a-163W (b) and (c).
Defendant has denied many of the pertinent parts of plaintiffs' complaint and filed four special defenses as follows:
First, no action for inverse condemnation may be brought against a state agency, such as defendant, which does not have the power of eminent domain; Second, sovereign immunity; Third, an owner of real property is not entitled to be paid for reduction in the value of his property for a valid exercise of the state's police power; Fourth, the public duty doctrine.
Defendant has also moved to dismiss this action for failure of plaintiffs to make a prima facia case.
 FACTS
One plaintiff is Evandro S. Santini (Evandro) who has been a developer and builder of single family homes and rental apartments in the Towns of Tolland, Vernon, Ellington and Coventry for many years. He is the President and Treasurer of the other plaintiff Santini Homes, Inc. (Homes), a Connecticut corporation that is in the construction business. It is as so-called Subchapter S corporation for federal income tax purposes and Evandro derived income or loss on a pass-through basis from Homes.
From 1985 through 1991, the plaintiffs were engaged in the possible development and construction of a subdivision known as Ellridge Estates.
In 1985, Evandro purchased 20 acres of land adjacent to Abbott Road in Ellington for $147,500. The property was, and remains, zoned for single-family residential development on lots of at least 30,000 square feet if served by sewers and 40,000 square feet with on-site septic systems. That property at that time was located within the Town of Ellington's sewer district, making it eligible for connection to the Ellington public sewer system Water supply was available to that property. There are no wetlands or other environmental obstacles to residential development of the 20 acres. The land is located across Abbott CT Page 8485 Road from the Ellington Country Club, an 18 hole golf course and full scale country club.
In 1985, the plaintiffs obtained from the Ellington Planning and Zoning Commission (PZC), subdivision approval for a 16 lot subdivision on these 20 acres. Evandro proceeded to construct the infrastructure of Ellridge Estates, including the water supply connections, drainage improvements, and the access road. In 1985, the plaintiff Evandro was asked by the Ellington Water Pollution Control Authority (WPCA) to install a "capped sewer line" within the subdivision, i.e., a sewage disposal pipe to be constructed beneath the access road to the lots, and to be connected to the public sewer system. He agreed to do so, and installed a "capped sewer" beneath the access road.
In December 1986, Evandro transferred the Ellridge Estates property to Homes for $864,000.
The real estate market began to deteriorate in 1987.
In March 1988, Evandro purchased the adjoining 54 acre parcel, which has several hundred feet of frontage on a Town road called Pinney Street, for $1,075,000. Ten acres of this property, located within 600 feet of Pinney Street, was, and remains, zoned for multi-family residential use. The balance is zoned for single-family homes in the same manner as the 20 acre parcel. This property in 1988 was also in the Town's sewer district, had available water supply connections, and contained no wetlands or other environmental obstacles. At the time of purchase, the Evandro terminated agricultural use of the Pinney Street property.
With the purchase of this second parcel, the plaintiffs had in place the land for a proposed Santini Village (Village). They proceeded with their strategic plan, which was to establish luxury homes on the 16 lots in Ellridge Estates and then proceed with residential development of the remaining 54 acres of Village, sometimes known as "Ellridge Estates II," with smaller lots and less expensive single-family homes. The plaintiffs also considered at times multi-family development on the ten acres closest to Pinney Street.
In late 1987, Homes began construction of two model homes on lots in the 16 lot subdivision. This construction proceeded slowly. In 1989, Homes began construction of two more model CT Page 8486 homes. From late 1989 through the Spring of 1991, construction of the infrastructure of the subdivision continued. No houses were sold prior to the notice. In late 1990 and early 1991, Evandro secured the financial means to lend or give money to Homes so that it could proceed with sales and construction of additional homes in Ellridge. He used the substantially increased income from his newly built rental complex in Vernon as security to borrow more than $20 million from Prudential Insurance Company, Manufacturers Life and the New Connecticut Bank and Trust/FDIC. The average interest rate of these loans was approximately 9 percent. In addition, in March 1991, Society for Savings, the construction lender for Ellridge, established a mortgage loan program with favorable terms for several residential properties, including Ellridge. This availability of mortgage money for residential buyers was uncommon at that time, and may have indicated the beginning of the end of what had been called the "credit crunch" of 1989-90.
In March 1991, the Ellington WPCA removed all but ten acres of the Ellridge property from the town's sewer district. This affected the Ellridge subdivision by rendering the sewer line, installed at the Town's direction and approval, useless, and by devaluing to a degree the lots, but because Ellridge had been approved with septic systems, construction and values there were not substantially affected. This action did devalue the adjacent 54 acre Homes property.
On June 10, 1991, defendant announced that the Ellridge property was one of three candidate sites for the construction of a disposal facility for low-level radioactive nuclear waste. About two weeks later it identified five back up sites in other areas. One of the many steps required before a site was selected for taking by eminent domain was the recognition of one of the three possible sites as a "preferred site". That was never done.
Such waste remains radioactive for many years and is hazardous to human health. The Service designated 250 acres in Ellington as a candidate site; this acreage included all of the Homes 54 acre Pinney Street parcel and all 12 of the approved and completed subdivision lots not yet built upon. The boundary of the proposed facility did not include the four constructed single-family homes in Ellridge. Part of the access roads within Ellridge that were to serve the twelve empty lots were part of the candidate site. CT Page 8487
There is no evidence that defendant had filed any notice or lien on the Ellington land records in regard to the designation.
The site designation process was secret. The plaintiffs did not know of the proposed site selection process before the notice announcement.
Funding for the Service's low level radioactive waste program does not come from the State of Connecticut's general revenues or a special appropriations. It is funded (with the exception of money for land acquisition, the source of which the legislature had not decided in 1991 and still has not resolved) from the "Low Level Radioactive Waste Fund", which consists of assessments on institutions within the state, that generate low level radioactive waste under Conn. Gen. Stat. § 22a-163o. The Department of Environmental Protection controls this fund and assesses generators based on the value of disposal from the previous year at rates determined according to a budget prepared by the Office of Policy and Management and approved by the legislature.
Announcement of the three candidate sites was noted in the community of Ellington. It had some negative effect on real property sales in the vicinity of the three candidate sites. Homes had some difficulty in selling constructed homes on the four lots outside of the designation area. The first four lots of the subdivision being already under construction for residential use, the remaining twelve lots were clearly committed to subdivision use and any alternative use of the property would be clearly "second best". When home sales resumed, the plaintiffs were required to provide minor incentives to achieve sales.
The plaintiffs were unable to proceed with residential development, and thus obtain funds from sales to pay down their debts, because any additional construction might not have been compensable in eminent domain proceedings if the sites were eventually taken. In early November 1991 the plaintiffs began to negotiate with a Jeffrey Zonfaly, also known as Jeffrey Zee (Zonfaly), in regard to the purchase of one of the four houses (Lot 16). Zonfaly began the negotiations at about "half the price". Zonfaly's wife was then expecting a child. Homes and Zonfaly agreed as to the purchase of the house on or about April 23, 1992. Zonfaly closed on that house on August 11, 1992, for $530,000. In June 1997 Homes bought the house back form Zonfaly for $460,000 or $470,000. CT Page 8488
In December 1991 that house was appraised for $400,000 by an appraiser who took the notice into consideration.
After talking to Zonfaly but before the recission of the notice, plaintiffs also talked about the purchase of one of the four houses with a James Wysocki who offered "in the middle of the $300's," i.e. the mid $300,000 range. Wysocki offered a $50,000 deposit. Homes refused the offer.
Plaintiffs had offered the houses originally for $500,000 each more or less. Between 1989 and March 1991 Homes had lowered the asking price of each of the unsold homes by $50,000.
Edward Heberger, a Connecticut real estate appraiser made his appraisal in August 1995 and recently updated it. That appraisal separates the economic effects of the Service's designation from other conditions of the market for real estate and residential development in Connecticut during 1991 and the following years, and separates the effects of the removal of most of plaintiffs' property from the Town's sewer district in March 1991 from the effects of the Service's June 1991 action.
Mr. Herberger also determined a reasonably probable profit margin and absorption period for the homes to be constructed.
The appraisal states that just prior to the designation, the property was worth more than $2.6 million and that after the designation, this value effectively vanished. The appraisal calculates the financial impact to be $650,000 for delayed fair market value on the real property and homes, and $240,000 for delayed construction profits from the sale of single-family homes in Ellridge Estates. Finally, the report calculates $65,000 in damage for delayed value of the Pinney Street land, for a total of $955,000.
Plaintiffs also will offer at trial the testimony and report of Thomas W. Henry, MAI. Mr. Henry appraised both the Ellridge Estates and Pinney Street parcels to determine their fair market value only for agricultural purposes. He found Ellridge had none as of June 11, 1991. As to the Pinney Street land, Mr. Henry said that for agricultural use before the designation it was worth $110,000 and after it was worth $55,000.
 PLAINTIFFS
CT Page 8489
Both Evandro and Homes bring this action. At the time suit was brought Homes owned the 16 lot subdivision and Evandro owned the 54 acre Pinney Street property. Money was given or lent without interest by Evandro to Homes. Each of these entities might be entitled to be paid for a taking of property but only of its own property. Throughout plaintiffs' briefs they speak of "their property" and do not seem to distinguish the two parties.
There was no claim of an "alter ego" here. Zaist v. Olsen,154 Conn. 563. As far as compensation for a pure taking each might be compensated for the taking of its own property. However, as to any possible profits the court cannot separate the two and even if such profits were legally chargeable, could not mathematically award profits.
 LAW I. Re: Liability A. Categorical Taking
Plaintiffs allege that the designation of the area of the 12 lots of the subdivision and the Pinney Street site as one of three finalists for acquisition as a low-level radioactive waste disposal facility is a taking. They rely heavily on the case ofLucas v. South Carolina Coastal Council, 505 U.S. 1003. In that matter the defendant council acted on a state statute that prohibited building in coastal areas under certain conditions. The plaintiff Lucas owned property in such an area for two years before the statute was enacted. He was refused a building permit for his land.
The U.S. Supreme Court held that where the governmental action leaves "the owner of land without economically beneficial or productive options for its use" that is a taking. Id. 1018. It also held that Lucas land, under the statute, had no economic or productive use. Our Connecticut cases call this a confiscation test and say it is no different from Lucas. Bauer v. WasteManagement of Connecticut, Inc., 234 Conn. 221, 255 f.n. 17;Dooley v. Town Plan Zoning Commission, 151 Conn. 304, 311-312;Danforth v. United States. 308 U.S. 271-285. This is not the situation here.
None of the experts said plaintiffs' land had no economic or CT Page 8490 productive use except one expert said that the Ellridge had no agricultural value and the Pinney Street land had lost one-half its value as agricultural land.
The court finds both Ellridge and Pinney Street did have use and value after the notice.
 B. Designation
The defendant did not designate plaintiffs' property to be taken by the state but only that it was one of three properties under consideration for taking. The defendant also identified for the public five "back-up" sites. The selection of three from which only one was to be taken was part of the state's planning process. Such planning is not actionable. Textron, Inc. v. Woods,167 Conn. 334, 346; Smith v. City of Brenham, Tex., 865 F.2d 662,663-664.
"The rule is firmly established in this state that where no land is physically taken and no interest in it which the law recognizes is extinguished or affected in a manner detrimental to the owner, the prohibition contained in Article First § 11 of our Constitution against taking of property for public use without just compensation does not apply." Benson v. HousingAuthority, 145 Conn. 196, 200.
"A reduction or increase in the value of property may occur by reason of legislation for or the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered as a `taking' in the constitutional sense."Danforth v. United States, 308 U.S. 271, 285 (1939).[1]
 II. Damage
If damages were to be awarded they would be for loss of use of the twelve lots in the Ellridge subdivision and the Pinney Street property for the time in which the designation of the three sites existed.
 A. ELLRIDGE
The court finds that the total dimunition in value of the twelve Ellridge Estate lots was $480,000. The loss for the lots outside the notice area would have been $170,000 but of course they were not part of any suggested taking. CT Page 8491
 B. PINNEY STREET
The court finds that the total dimunition of the Pinney Street property if the state were liable was $65,000 for a twenty-four month period. That time period includes the so-called "stigma period".
The idea of a "stigma period" was raised in Lucas which said, "Of course, the State may elect to rescind its regulation and thereby avoid having to pay compensation for a permanent deprivation. But where the [regulation has] already. worked a taking of all use of the property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." Lucas. 1030 f.n. 17 (citation omitted). That is not our situation.
There is law to the effect that a temporary taking may occur where the state goes beyond mere planning and gives "some definitive indication that the state's intent to condemn the property in question has become fixed and irreversible." Textron.Inc. v. Wood, 167 Conn. 334, 348. There is no such evidence in this case.
 C. FEAR FACTOR
In regard to the possible taking of any of the property not designated i.e. the four houses, plaintiffs seem to rely on the fear factor. Speculative fear does not even allow an injunction for nuisance. Nicholson v. Connecticut Half-Way House. Inc.,153 Conn. 507, 511.
 D. PROFITS
Plaintiff claims lost profits and compensation for a taking. The potential for profits from the development of the land would be part of the considerations taken into account in setting the value of the property for condemnation purposes but may not be given in addition. Laurel Inc. v. Commissioner of Transportation,180 Conn. 11, 37-48.
 E. STIGMA PERIOD
First, the plaintiffs have failed to sustain their burden of proof that a "stigma period" existed after the legislature CT Page 8492 amended the statute and terminated any threat of a taking.
Second, the plaintiffs have failed to sustain their burden of proof that the enactment of the corrective legislation did not end any problems in regard to threat of a taking as of that date.
Third, the effect of the so-called "stigma period" is produced by unreasonable fear i.e. the "subjective apprehension" of another. That is not compensable. Nicholson v. ConnecticutHalf-Way House, Inc., 153 Conn. 507, 512 (not grounds for injunction); Wood v. Wilton, 156 Conn. 304, 312. (A "speculative and intangible fear".)
 SPECIAL DEFENSES
First, state actions are capable of consisting a taking even though eminent domain is never used. Lucas supra.
Second, the defense of sovereign immunity is not applicable to unconstitutional state actions. Horak v. State, 271 Conn. 257,261.
Third, if the state acts unconstitutionally and a taking of all or substantially all of the economic or productive use of the property is destroyed suit may be brought. Lucas, supra.
Fourth, if the state has a public duty in some particular circumstances it can act to fulfill it but not beyond the point of rendering a citizen's property essentially uneconomically beneficial or productive for use. Lucas, supra.
 III. CONCLUSION
The court is convinced that in all probability the notice did not result in a practical confiscation of land, either permanently or temporarily. But we go beyond that to the tests as set out in Bauer v. Waste Management of Connecticut, Inc., supra 256-257. The court has gone over those and concludes under the facts of our case there was no unconstitutional taking of any kind.
Judgment for defendant.
O'Neill, J. CT Page 8493